UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| v. | § | CRIMINAL NO. 3:10-CR-0021-B |
| | § | |
| WAYLON MCDONALD, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION AND ORDER

Before the Court is Defendant's Opposed Motion to Suppress Statements and Memorandum in Support Thereof ("Defendant's Motion to Suppress") (doc. 24). A hearing was held on the Motion on April 9, 2010 (the "Hearing"). For the reasons stated below, the Court finds the Motion should be and hereby is **DENIED** (doc. 24).

I.

BACKGROUND[1]

Defendant Waylon McDonald ("McDonald") is charged with conspiracy to commit bank robbery in violation of 18 U.S.C. § 371 and bank robbery in violation of 18 U.S.C. § 2113(a) and 18 U.S.C. § 2. The events leading to McDonald's arrest occurred on January 19, 2010. On the day in question, officers with the Dallas Police Department responded to a report of a robbery at the Comerica Bank located at 5201 E. RL Thornton Freeway. As part of their investigation of the crime scene, the officers discovered a purse near the Comerica Bank which contained identification and

---

[1] Unless otherwise noted, the Court takes its factual account from the evidence presented at the Hearing held April 9, 2010. Officer Jason Jarc, Officer Mario Gomez, Detective Anthony Winn, and Defendant Waylon McDonald testified at the Hearing.

personal papers belonging to co-defendant Inequa Rushing ("Rushing"). From these recovered items, the officers were able to deduce two potential addresses for Rushing. The officers also acquired a description of two suspects - one male and one female - and a description of the vehicle used by the suspects.

Officers Jason Jarc and Mario Gomez undertook an investigation of the potential addresses to try and locate the suspects. The first address did not yield anything suspicious. At the second address, the officers noticed a placard on the window indicating an oxygen tank was in use. Assuming an elderly person resided at the address, the officers concluded the suspects were not located at the second address. However, upon departing from the second address, the officers noticed a man matching the male suspect's description standing by a vehicle matching the vehicle description. The officers observed the man approach the residence in question, knock, and enter.

Accordingly, the officers approached the residence, knocked, and were greeted at the door by McDonald who was holding a baby. Initially, McDonald told the officers he was at the residence alone. McDonald subsequently informed the officers Rushing was hiding in the back of the house. The officers asked to enter the house, and McDonald allowed them to enter. Officer Jarc moved to the back of the house to locate Rushing, while Officer Gomez placed McDonald in handcuffs at the front of the house as a safety precaution. Subsequently, Detectives Ned, Mumford, and Winn of the Dallas Police Department arrived at Rushing's residence and began to conduct a follow-up investigation. From the time McDonald was initially handcuffed until the time he left the house, McDonald remained in a separate area of the residence from Rushing.

Ultimately, McDonald was transported to the Dallas Police Department Headquarters ("Headquarters"). While being transported, McDonald informed the officers he felt ill and was

having trouble breathing. Upon arrival at Headquarters, the paramedics evaluated McDonald and determined he was okay. Following this medical check, Detectives Mumford and Winn informed McDonald of his *Miranda* warnings and questioned him regarding the robbery. Throughout the interview, McDonald continued to note he felt sick to his stomach and was having difficulty breathing.

## II.

## LEGAL STANDARD

The Fifth Amendment privilege against self-incrimination prohibits the admission of statements given by a suspect during a custodial interrogation without prior warning. *United States v. Gonzales*, 121 F.3d 928, 939 (5th Cir. 1997). The Supreme Court has defined custodial interrogation to mean questioning initiated by law enforcement officers after being taken into custody. *Id.* (quoting *Illinois v. Perkins*, 496 U.S. 292, 296 (1990). A suspect is considered to be in custody "when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988).

In the past, police officers were known to employ a unique strategy for custodial interrogations. *See Missouri v. Seibert*, 542 U.S. 600, 609-10 (2004). Under such strategy, officers would interrogate a suspect without first rendering *Miranda* warnings until a confession was obtained. *Id.* After such confession, *Miranda* warnings were given and the suspect was asked to repeat his previous confession. *Id.* The Supreme Court expressly addressed such "question first" practices in *Missouri v. Seibert*. *Id.* In analyzing whether statements made following the *Miranda* warnings under

such practices were admissible, the Supreme Court commented "it would ordinarily be unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle." *Id*. at 613.  Thus, the Supreme Court noted "[t]he threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances, the warnings could function 'effectively' as *Miranda* requires." *Id*. at 611-12. Notably, the Supreme Court distinguished "question first" practices from situations in which statements are made without a *Miranda* warning, a definitive passage in time occurs, *Miranda* warnings are given, and new statements are made as part of a separate interrogation.  *Id*. at 615-16 ("In *Elstad*, it was not unreasonable to see the occasion for questioning at the station house as presenting a markedly different experience from the short conversation at home; since a reasonable person in the suspect's shoes could have seen the station house questioning as a new and distinct experience, the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission."); *see Oregon v. Elstad*, 470 U.S. 298 (1985).

### III.

### ANALYSIS

McDonald argues the Court should suppress any statements made to the police at the Rushing residence, as well as any statements made thereafter at Headquarters.  (Opp. Mot. To Suppress Statements and Mem. In Supp. Thereof 3-4 (citing *Missouri v. Seibert*, 542 U.S. 600 (2004)).)  McDonald contends he was clearly placed in custody shortly after the officers initially entered the Rushing residence.  (*Id*. at 3.)  As such, McDonald was entitled to a *Miranda* warning prior to any interrogation.  (*Id*.)  Further, when McDonald was finally given his *Miranda* warnings

at Headquarters, it was at a time when McDonald was ill and complaining of chest pains. (*Id*.) As such, McDonald contends "[t]here is a substantial question as to whether the *Miranda* warnings given at the Police Station were effective enough to accomplish their objective under such circumstances and after the taint of the earlier unwarned interrogation." (*Id*.)

The Government responds that McDonald was not in custody at the Rushing residence, but rather was arrested after Rushing's comments incriminated him. (Gov.'s Consolidated Resp. To Def.'s Pre-Trial Mots. 3.) McDonald had been merely handcuffed to protect the officer's safety and any statements voluntarily made by McDonald did not violate his Fifth Amendment rights. (*Id*.) Further, the Government notes McDonald made no incriminating statements while handcuffed at the residence and, therefore, the Government does not plan to introduce any statements made at Rushing's residence. (*Id*. at 3 n.2.) The Government additionally argues the facts of the instant case are distinguishable from those of *Seibert*. (*Id*. at 4.)

With regard to the statements made at the Rushing residence, McDonald's freedom was significantly restrained while he was detained in handcuffs. Thus, it appears any statements made while McDonald was handcuffed were made while he was "in custody." Accordingly, a determination as to whether any such statements are admissible would turn on whether they were made as part of questioning initiated by officers. However, the Court finds any analysis on this point is moot as the Government does not intend to offer any statements made at Rushing's residence at trial. Thus, the Court turns its attention to the admissibility of McDonald's statements at Headquarters in light of any prior questioning at the Rushing residence.

Under *Seibert*, if the statements made at the station appear to be part of a "question first" strategy, such a practice would render McDonald's *Miranda* warnings ineffective and make any

statements subsequent to such warnings inadmissible. However, a review of the evidence presented at the Hearing does not suggest the officers were employing such a "question first" strategy. Rather, based on the testimony offered at the Hearing, it appears any minor statements made by McDonald while at the Rushing residence were not part of any formal police interrogation. No officer questioned McDonald at Rushing's house. Instead, it appears McDonald was only formally questioned after being transported to Headquarters and given his *Miranda* warnings. Thus, it appears McDonald was adequately apprised of his rights via his *Miranda* warnings prior to making any statements.

The Court additionally notes that throughout the questioning, McDonald indicated he felt sick and was having trouble breathing. However, it does not appear McDonald was incapacitated by illness, nor that he was incoherent. Rather, it appears McDonald was most likely feeling ill due to his nervousness about being questioned. The officers provided McDonald with adequate medical attention, and he was determined to be fine. Accordingly, the Court finds McDonald's health during his interrogation does not affect the admissibility of his statements.

## IV.

## CONCLUSION

The Court finds McDonald's statements are admissible. As such, the Court finds Defendant's Motion to Suppress should be and hereby is **DENIED** (doc. 24).

SO ORDERED.

DATED May 24, 2010

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE